STATE OF NEW JERSEY, PLAINTIFF-RESPONDENT, v. HENRY MANNING, DEFENDANT-APPELLANT.

Argued January 8, 1980—Decided April 2, 1980.

418

*Susan Slovak*, Assistant Deputy Public Defender, argued the cause for appellant (*Stanley C. Van Ness*, Public Defender of New Jersey, attorney).

*Maris Konray*, Deputy Attorney General, argued the cause for respondent (*John J. Degnan*, Attorney General of New Jersey, attorney).

The opinion of the Court was delivered by

SULLIVAN, J.

Defendant Henry Manning was tried by jury and convicted of breaking and entering, robbery while armed, conspiracy and contributing to the delinquency of a minor. The theory of the State at trial was that defendant, working with a juvenile,

waited outside the robbery victims' home in the getaway car while the juvenile entered the home and carried out the robbery.

The Appellate Division affirmed the convictions. 165 *N.J.Super.* 19 (1978), 166 *N.J.Super.* 56 (1979). One judge dissented on the ground that a detective's testimony on how he elicited an admission from defendant of his involvement with the juvenile contained highly prejudicial inadmissible hearsay and required reversal of the conviction. This appeal as of right followed, *R.* 2:2–1(a)(2), limited to the issue raised by the dissent.[1]

The basic facts are undisputed. The juvenile broke into the home of an elderly couple and robbed them at gunpoint. While the robbery was taking place, the police were notified of a breaking and entering in progress. Police cars responded to a radio call and arrived at the home just as the couple ran out the front door. A search of the house disclosed the juvenile hiding in a closet.[2]

The first police to arrive at the scene found defendant seated in a parked car a few doors away from the victims' home. The motor of the car was running but the lights were out. Defendant was slumped down in the driver's seat. Upon being questioned by an officer defendant said "I ain't done nothing" and added that he was on his way home and had stopped to rest. The officer noticed that defendant was wearing a hat and that there was another hat on the rear seat of the car. Defendant said the second hat was his but when it was placed on his head it did not fit.

After the juvenile had been apprehended, the two were taken to police headquarters and interrogated separately. Defendant,

---

[1]Defendant filed a petition for certification as to other issues which was denied. 81 *N.J.* 358 (1979).

[2]The juvenile later was charged as an adult, pleaded guilty to armed robbery and was sentenced to the Youth Correctional Institution Complex.

who was questioned by Detective Dilkes, was advised of his constitutional rights and then told he was being charged with armed robbery and that he had been implicated in the incident by the juvenile. In response, defendant shook his head and said "I should ought to let the kid steal that lady's pocket." He then cut himself short and said nothing further.

In fact, the juvenile had implicated defendant in the robbery. However, he later recanted and, in a *Williams* hearing,[3] denied that defendant was involved in any way. For that reason the State did not call the juvenile as a witness at trial. The defense likewise elected not to have the juvenile testify apparently for the reason that his written signed statement implicating defendant could then have been offered in evidence by the State. See *Evid.R.* 63(1)(a).

At trial, when the State attempted to put defendant's cryptic remark "I should ought to let the kid steal that lady's pocket" into evidence, defense counsel objected to any testimony by the officer that he had told defendant that the juvenile had implicated him in the robbery. The court ruled that the reference would be allowed as background for defendant's response but would be subject to cautionary instructions to the jury.

The trial then proceeded with Detective Dilkes on the stand as a State's witness:

Q  All right. At the time you interviewed him, what if anything did you say to Mr. Manning?

A  At the time I advised him that he was being charged with armed robbery at the home of the Braun residence and that he had been implicated in the incident by the King youth.

THE COURT: Members of the Jury, on this point I instruct you as follows: This statement as to the defendant being implicated by the King youth is allowed into evidence for your consideration only for the purpose of giving you the background for the response that—any response the defendant may have made to what Detective Dilkes said to him. You're not to consider this in any

---

[3] *State v. Williams,* 59 *N.J.* 493, 496–497 (1971).

way as proof that somebody else, specifically the juvenile, implicated the defendant in this crime. The juvenile is not in Court and his testimony most likely will not be adduced and you're not to speculate and you're not to speculate either way about the reasons for that and as you can appreciate in police work it may very well be that in order to get some response from a suspect, they may represent something to the suspect that is not really true for the purpose of getting some response from him, but you're not to speculate about that, whether it's true or not and I'm telling you to and instructing you very specifically disregard this portion of what Detective Dilkes told the defendant as any proof that somebody else was involving this defendant or saying that he was implicated in this incident. Again, it is simply for you to judge what weight if any is to be given to the response, any response the defendant may have made to the statement. You may continue, Mr. Zeltner.

Q Detective Dilkes, did the defendant reply to you when you stated that to him?

A Yes, sir. He did.

Q Would you tell us what he said to you, please?

A I don't have my report exactly, but he shook his head in a negative way and stated to me that he should have ought to let the kid steal that lady's pocket and then he cut himself short and that was the end of the interview.

As part of its case, the State produced proof that a fingerprint taken from defendant's car matched that of the juvenile. Defendant did not take the stand and, as noted above, was found guilty on all charges.

The State argues that Detective Dilkes' comment to defendant was necessary to give meaning to defendant's response. It submits that the comment was not admitted for its truth and that the jury was promptly and emphatically instructed that it was to be used solely as background for defendant's response and not as proof that the juvenile had in fact implicated defendant in the robbery.

Although the comment was admitted for a limited purpose and that the jury was promptly and emphatically so instructed, we conclude that the potential for prejudice was devastating. The State's burden was to connect defendant with the juvenile and the robbery. It could not call the juvenile as a witness as he had recanted at a *Williams* hearing and testified that defendant

had nothing to do with the robbery or the juvenile being at the scene. However, through the mechanism of Detective Dilkes' comment, the State was able to have the jury told that the juvenile had implicated defendant in the robbery. Despite the court's admonition to the jury as to the limited purpose and effect of the comment, it is difficult to see how the jury would not give such a crucial statement some probative effect. *State v. Bankston*, 63 *N.J.* 263 (1973). If the comment had been admitted as substantive proof, it would undoubtedly have been highly prejudicial hearsay, would have denied defendant a right of confrontation and would have constituted reversible error. See *Bruton v. United States*, 391 *U.S.* 123, 88 *S.Ct.* 1620, 20 *L.Ed.*2d 476 (1968); *State v. Young*, 46 *N.J.* 152 (1965). The State's attempt to draw a line of demarcation is too tenuous where as here a defendant's constitutional rights are involved. The comment should have been excluded under *Evid. R.* 4.

The detective could simply have been asked what defendant's response was when advised that he was being charged with armed robbery. There was no need to have the jury told that defendant had been implicated in the robbery by the juvenile.

The judgment of the Appellate Division is reversed, the judgment of conviction set aside and the matter remanded for a new trial.

CLIFFORD, J., dissenting.

During the evening hours of December 4, 1975, two elderly victims were terrorized, abused, threatened, and robbed at gunpoint in their home. The police apprehended the juvenile gunman, G. K., on the spot. At the same time they encountered

defendant, Manning, slumped down in the driver's seat of his automobile, parked at the curb just two doors away from the victims' home, with the engine running, lights out, and driver's door open. After protesting that "he didn't do nothing," defendant proffered a ludicrous excuse for his presence at the scene. On the back seat of his car was a hat which defendant claimed was his but which was obviously too small when placed on his head, both at the scene and before the jury at his trial. In addition, the police recovered from the inside of the rear passenger door on Manning's vehicle a fingerprint identical to the juvenile's.

Small wonder that with this evidence before it the jury convicted defendant. Under the circumstances it did not require a Scotland Yard criminologist to make the connection between defendant, the juvenile, and the crime. Nevertheless, in the face of the overwhelming inculpatory proof, the majority reverses the conviction because it concludes the jurors, in flagrant violation of the trial court's specific and detailed instructions, gave "probative effect" to a "crucial statement" of an investigating officer, Detective Dilkes. *Ante* at 422.

That statement was made by Dilkes in response to a question on direct examination as to what he had said to Manning while interviewing him. Dilkes said:

> At that time I advised him that he was being charged with armed robbery at the home of the Braun residence and that he had been implicated in the incident by [G.K.].

Thereupon the trial court immediately issued the explicit limiting instruction. Detective Dilkes then testified as to Manning's response to that statement:

> I don't have it in my report exactly, but he shook his head in a negative way and stated to me that he should have ought to let the kid steal that lady's pocket and then he cut himself short and that was the end of the interview.

The claim of error is directed only at Dilkes's statement that the juvenile had implicated Manning (which was the fact). No one suggests that defendant's response, characterized by the majority as "cryptic," *ante* at 420, was inadmissible for any reason.

Initially, I perceive that while that remark—"[I] should ought to let the kid steal that lady's pocket * * * " is wanting in a certain elegance of expression, there is nothing "cryptic" about it. Given the context in which it was made, it unmistakably tied defendant to G.K.—if, in the face of the other abundant evidence, there remained any doubt on that score. Its meaning and import are entirely clear.

But the detective's reference to G.K.'s having implicated Manning is assailed by the Court on the grounds that its "potential for prejudice was devastating," and the trial court's instruction failed either to cleanse the detective's statement of its hearsay taint or avoid the denial of defendant's right of confrontation. *Ante* at 421. This, despite the Court's acknowledgement "that the comment was admitted for a limited purpose and that the jury was promptly and emphatically so instructed * * *." *Ante* at 421.

As authority for its conclusion that the jury would give the detective's "crucial" statement about G.K. implicating Manning "some probative effect," the majority relies upon *State v. Bankston*, 63 *N.J.* 263 (1973). For its determination that the statement constitutes prejudicial hearsay and violates defendant's right of confrontation, the Court looks to *Bruton v. United States*, 391 *U.S.* 123, 88 *S.Ct.* 1620, 20 *L.Ed.*2d 476 (1968), and *State v. Young*, 46 *N.J.* 152 (1965). In my view of the instant case the cited authorities are simply inapplicable.

In *Bankston* the prosecutor told the jury in his opening statement that detectives had been actively investigating the defendant. A detective testified that the arresting officers, after speaking with an informant, had gone to look for a described person known to have narcotics in his possession, and that they found an individual who fit this description. The

prosecutor's summation included still another reference to the fact that the detectives were looking for a person who fit a particular description. The trial judge then instructed the jury to disregard references to the investigation or description. 63 *N.J.* at 266–67. He did not, however, instruct them that it was impermissible to draw an inference of guilt from this testimony. *Id.* at 268. Even though the detectives never specifically repeated what the informer had told them, the *Bankston* Court found that the jury was inescapably led to conclude that an informer had told the detectives that defendant was committing a crime. The Court distinguished this from the merely possible inference when an officer testifies that an arrest was made "based on information received." Because the informer was not in court and was not subject to cross-examination, the statement was hearsay. Moreover, the judge addressed his curative instructions only to the prosecutor's remarks and said nothing to limit the detective's testimony. Therefore, the instructions were viewed as insufficient to "remove the prejudicial effect of that testimony from the minds of the jury." *Id.* at 272.

By comparison there is nothing in the record before us to suggest that the prosecutor's opening statement touched upon any objectionable material. More importantly, the limiting instructions here were given, as the majority notes, "promptly and emphatically." The trial court, having been forewarned of the problem and having obviously deliberated in advance on the way to deal with it, told the jurors in explicit and forceful terms that Dilkes's "statement as to the defendant being implicated by [G.K.] is allowed into evidence * * * only for the purpose of giving you the background for * * * any response the defendant may have made to what Detective Dilkes said to him." This was followed immediately with the admonition that "[y]ou're not to consider this in any way as proof that somebody else, specifically the juvenile, implicated the defendant in this crime." And then, to top it off, the court suggested to the

jurors that police have been known to tell someone under investigation something not entirely true, to the end that the suspect may incriminate himself, the implication being that that might very well be what happened in this case. In so doing the court proffered a perfectly plausible alternative explanation for Dilkes's comment to Manning.

The instructions could not have been clearer. I do not know what more could have been asked of this trial judge under the circumstances. As long as we continue to have faith in a jury's ability generally to follow a trial court's directives, see *State v. Manley*, 54 *N.J.* 259, 270 (1969), we should not hesitate to give effect to the instructions in this case. The proposition put to the jurors involved no occult theory of law. It called upon them to do no more than bring a measure of plain common sense to their important civic duty.

It remains only to point out that while the Court's reference to *Bruton* and *Young* is couched in hypothetical terms, *ante* at 422, and is accurate for that purpose, the hypothesis does not fit this case. Dilkes's comment was *not* offered as proof of the fact that G.K. had implicated Manning, and, as I have endeavored to demonstrate, the jury was so instructed.

I would affirm.

SCHREIBER and POLLOCK, JJ., join in this dissent.

*For reversal and remandment*—Chief Justice WILENTZ, and Justices SULLIVAN, PASHMAN and HANDLER—4.

*For affirmance*—Justices CLIFFORD, SCHREIBER and POLLOCK—3.