689 A.2d 846

STATE OF NEW JERSEY, PLAINTIFF–RESPONDENT, v.
DANNY E. HARRIS, DEFENDANT–APPELLANT.

Superior Court of New Jersey
Appellate Division

Submitted February 26, 1997—Decided March 18, 1997.

Before Judges BAIME and PAUL G. LEVY.

*Susan L. Reisner*, Public Defender, attorney for appellant (*Steven M. Gilson*, Designated Counsel, of counsel and on the brief).

Appellant submitted a supplemental *pro se* brief.

*Peter Verniero*, Attorney General, attorney for respondent (*Jennifer L. Gottschalk*, Deputy Attorney General, of counsel and on the brief).

The opinion of the court was delivered by

BAIME, J.A.D.

A jury found defendant guilty of conspiracy to commit murder (*N.J.S.A.* 2C:5–2), purposeful or knowing murder (*N.J.S.A.* 2C:11–3a(1) and (2)), possession of a handgun without a permit (*N.J.S.A.* 2C:39–5b), and possession of a firearm for an unlawful purpose (*N.J.S.A.* 2C:39–4a). The jury declined to impose the death penalty. On the conviction for murder, defendant was sentenced to thirty years imprisonment without parole eligibility. A concurrent sentence of four years was imposed on the conviction for possession of a handgun without a permit. The remaining convictions were merged.

On appeal, defendant argues: (1) the trial court erred by denying his motion to suppress evidence, (2) the State failed to prove the authenticity of a tape recorded conversation allegedly engaged in by the co-conspirators, (3) the co-conspirator exception to the hearsay rule was applied improperly, (4) the testimony of the investigating police officer violated *State v. Bankston,* 63 *N.J.* 263, 307 *A.*2d 65 (1973), and (5) the cumulative effect of these errors was to deny defendant a fair trial. In a supplemental *pro se* brief, defendant claims: (1) his confession to the police should have been excluded, (2) the trial court's jury instructions did not adequately distinguish between aggravated manslaughter and reckless manslaughter, and (3) he was deprived of the effective assistance of counsel. We find no basis to disturb defendant's convictions.

I.

We need not recount the facts at length. The prosecution's theory was that defendant was hired by Georgia Wooten and Walter Wilson to kill Rondell Germany, the former boyfriend of Wooten's sister, Michelle. Wooten promised to pay defendant $500 to commit the murder. As part of the plot, Wooten lured Germany to her apartment building under the guise of mediating his dispute with Michelle. Defendant confronted Germany in the hallway and shot him from a distance of ten feet. Germany staggered into Wooten's apartment and fell to the floor. Defendant then stood over the victim and fired a second shot.

The killing was witnessed by Wooten's son, Lawrence. He testified in graphic detail about the chronology of events leading to Germany's death. According to Lawrence, his mother and Germany were seated on the second floor landing when defendant entered the building, pulled a gun from his waistband and opened fire. Lawrence recounted that his mother immediately left the hallway and entered her apartment. Defendant then pursued Germany, who managed to kick in the door to Wooten's apartment

before collapsing. Defendant quickly entered the room and fired another shot into the prostrate victim.

Lawrence testified that several minutes after the killing, the telephone rang. Responding to the call, Lawrence recognized the voice of his cousin, Wilson, who asked to speak to his mother, noting that he was calling at defendant's behest. After Wooten picked up the receiver, Lawrence, from a kitchen extension, heard Wilson tell his mother that defendant said he needed the money to flee the city that night. Wooten told Wilson not to come to the apartment, but that she would give the money to Lawrence. Wilson asked whether defendant had shot the victim in the heart. Wooten replied that she did not know, but that she believed defendant had shot Germany twice. The telephone call then terminated.

The police were immediately dispatched to Wooten's apartment where they found the door frame damaged as if there had been a forced entry. Germany was lying face down on the bedroom floor. Additional police personnel arrived shortly thereafter. As he mounted the stairs to the third-floor apartment, Detective John Molisso discovered a 9–millimeter Luger caliber bullet and a shell casing. A bullet hole was discovered in the floor of Wooten's apartment.

Earlier, Officer Peter DeAngelis had noticed an answering machine on a nightstand adjacent to the bed in the room in which the victim was found. The light on the machine was blinking, indicating that there was a recorded telephone message. Because the room was in disarray, DeAngelis decided to secure the tape to insure its preservation. When Molisso subsequently arrived at the apartment, he asked Wooten whether she would consent to a search. Wooten, who at that time was not considered a suspect, appeared cooperative and executed a written consent to search. The search yielded no incriminating evidence.

Wooten, Lawrence and Michelle were then transported to police headquarters for the purpose of giving statements. Before commencing the witness interviews, DeAngelis and Molisso listened to

the tape for the first time, but could not identify any of the voices. The officers replayed the tape when they interviewed Michelle. She identified the two primary speakers as Wooten and Wilson.

Recognizing that Wooten was now a prime suspect, the police advised her of her constitutional rights. She then confessed that she had hired defendant to kill Germany and that she had given Lawrence $500 to pay him for committing the crime. Wooten then executed a second consent to search. Molisso returned to Wooten's apartment and retrieved the $500 from Lawrence. Although Wooten's statement was not produced at defendant's trial, the tape recorded telephone call was played for the jury.

Defendant was arrested shortly after the killing. After being apprised of his constitutional rights, defendant gave a written statement indicating that he agreed to accompany Wilson to Wooten's apartment where Wilson was to "beat up" Germany in retaliation for Germany's violent assaults upon Michelle. Defendant further agreed to bring his gun so that Wilson "could take care" of Germany. Upon arriving at the building, the two men mounted the stairs. In his statement, defendant claimed that Germany "spotted" the gun and "charged" him. According to defendant, the gun fired twice as he fell against the wall. It is against this factual backdrop that we consider defendant's arguments. We address these points *seriatim.*

## II.

Prior to trial, defendant moved to suppress the tape recorded telephone conversation that was confiscated by Officer DeAngelis. The trial court determined that defendant had standing to challenge the seizure of the evidence, but nevertheless denied the motion.

We first address the question of defendant's standing. Since defendant was not charged with a possessory crime pertaining to the tape, he did not have "automatic standing" to challenge the search and seizure. *See State v. Alston,* 88 *N.J.* 211, 228–29, 440 *A.*2d 1311 (1981). However, in *State v. Mollica,* 114 *N.J.* 329, 554

A.2d 1315 (1989), the Supreme Court held that a "participatory interest" provides standing to a person who, attacking the seizure and prosecutorial use of incriminating evidence, had some culpable role, whether as a principal, conspirator or accomplice in a criminal activity that generated the evidence seized. *Id.* at 339–40, 554 A.2d 1315. Applying this broad concept of standing, we agree with the trial court that defendant had the right to mount his attack upon the seizure of the tape under the New Jersey Constitution. *See State v. Alston,* 88 *N.J.* at 226, 440 A.2d 1311.

We nevertheless reject defendant's claim that the seizure of the evidence was unlawful. Our reasons are several. Initially, we find that defendant lacked a sufficient privacy interest in Wooten's apartment to support the conclusion that the search violated his constitutional rights. Like its federal counterpart, the New Jersey Constitution protects only objectively reasonable expectations of privacy. *State v. Hempele,* 120 *N.J.* 182, 198–200, 576 A.2d 793 (1990). Such an expectation must be derived from "general social norms." *Id.* at 200, 576 A.2d 793 (quoting *Robbins v. California,* 453 *U.S.* 420, 428, 101 *S.Ct.* 2841, 2847, 69 *L.Ed.*2d 744, 751 (1981) (plurality opinion), *overruled on other grounds, United States v. Ross,* 456 *U.S.* 798, 102 *S.Ct.* 2157, 72 *L.Ed.*2d 572 (1982)). Within this analytical framework, we point to the uncontradicted evidence that immediately after the shooting Wooten fled into her apartment and closed the door, and that Germany, followed by defendant, forced his way in by breaking the door frame. Wooten later complained to Wilson about defendant's forced entry into her apartment. Apparently, she wished her living quarters to be hermetically sealed from the deadly acts she, by her agreement with defendant, had generated. We need not dwell upon the question whether her expectations in that respect were reasonable. But if a criminal is protected by a constitutional zone of privacy, surely Wooten had the right to prevent Germany and defendant from intruding into her apartment. "To hold that defendant may assert a constitutionally protected privacy interest in the very apartment to which he has unlawfully and forcibly

gained entry would constitute a raw injustice." *State v. Smith,* 291 *N.J.Super.* 245, 261, 677 *A.*2d 250 (App.Div.1996); *see also State v. Arias,* 283 *N.J.Super.* 269, 277–81, 661 *A.*2d 850 (Law Div.1992) (finding that defendant had standing to bring a motion to suppress but "ha[d] no reasonable expectation of privacy in effects left in a home that he commandeered at gunpoint"). "No 'general social norm' would countenance such an expectation on the part of an intruder, and we cannot conceive of how such a claim could be construed as 'reasonable.'" *State v. Smith,* 291 *N.J.Super.* at 261, 677 *A.*2d 250; *see also State v. Lugo,* 249 *N.J.Super.* 565, 568, 592 *A.*2d 1234 (App.Div.1991) (finding that defendant operating stolen automobile had no reasonable expectation of privacy within it). Defendant invaded Wooten's apartment where he shot and killed his prey. In our view, defendant had no constitutionally protected privacy interest in the premises.

Second, we perceive nothing objectively unreasonable in the seizure of the evidence. The police were dispatched to the scene to investigate a murder. In a fast-moving sequence of events, they were confronted with the victim's body, bullet holes and a blinking telephone answering machine possibly linked to the violent acts that had been committed only minutes before. The police were lawfully in the viewing area, and there was probable cause to associate the evidence with criminal activity. *Arizona v. Hicks,* 480 *U.S.* 321, 326–27, 107 *S.Ct.* 1149, 1153, 94 *L.Ed.*2d 347, 354–55 (1987); *Texas v. Brown,* 460 *U.S.* 730, 741, 103 *S.Ct.* 1535, 1543–44, 75 *L.Ed.*2d 502, 513 (1983); *State v. Lewis,* 116 *N.J.* 477, 485, 561 *A.*2d 1153 (1989); *State v. Bruzzese,* 94 *N.J.* 210, 237–38, 463 *A.*2d 320 (1983), *cert. denied,* 465 *U.S.* 1030, 104 *S.Ct.* 1295, 79 *L.Ed.*2d 695 (1984). The tape was seized not by reason of an invasive, exhaustive and wide-sweeping search, but rather by an exercise of reasonable and prudent caution of an investigating officer lawfully present at the scene of a crime. There is no right to commit a perfect crime or to escape detection. Nor is there any constitutional doctrine that requires the police to ignore what they perceive through their senses and reasonably associate with

criminal activity. The exclusionary rule must be anchored to the reason for its existence—to deter insolence in office. We discern no overreaching by the police here.

Finally, there is no question but that the evidence would inevitably have been discovered without reference to police error or misconduct. *State v. Sugar III*, 108 *N.J.* 151, 156, 527 *A.*2d 1377 (1987). We stress that on two separate occasions Wooten executed consents to search. It defies common sense to believe that the police would not have discovered and confiscated the tape had it not been secured previously for safekeeping by Officer DeAngelis. To suppress this highly incriminating evidence under these circumstances would constitute a serious insult to the judicial process. The motion to suppress was properly denied.

### III.

Equally unpersuasive is defendant's claim that the tape was not properly authenticated. In *State v. Driver*, 38 *N.J.* 255, 183 *A.*2d 655 (1962), our Supreme Court held in a somewhat related context that tape recordings are admissible upon the condition that (1) the recording device was capable of taking the statement or conversation, (2) the operator of the machine was competent, (3) the recording accurately reflected what was said, (4) no changes, additions or deletions were made, and (5) in the context of confessions normal rules pertaining to voluntariness were satisfied. *Id.* at 287, 183 *A.*2d 655; *see also State v. Cusmano*, 274 *N.J.Super.* 496, 517, 644 *A.*2d 672 (App.Div.1994).

These requisites for admission were clearly met. The recorded conversation was audible and not garbled or fragmented. The recording device operated properly. And finally, the tape that was produced at trial was unaltered. The authentication requirements were fully satisfied.

### IV.

We next consider defendant's argument that the tape recorded conversation constituted hearsay evidence and was im-

properly admitted in violation of the right of confrontation. Defendant asserts that the conversation between Wooten and Wilson occurred after the killing had taken place. He argues that the conspiratorial objective had been achieved at that point and thus the hearsay statements cannot be said to have furthered the unlawful agreement. Defendant further claims that there was no independent evidence of a conspiracy—a prerequisite for admission of conspiratorial statements under *N.J.R.E.* 803(b)(5).

The controlling principles are well settled. We briefly describe them here. Where two or more persons are alleged to have conspired to commit a crime, any statement made by one during the course of and in furtherance of the conspiracy is admissible in evidence against any other member of the conspiracy. *N.J.R.E.* 803(b)(5); *State v. Phelps,* 96 *N.J.* 500, 508, 476 *A.*2d 1199 (1984). Participation in a conspiracy confers upon co-conspirators the authority to act in one another's behalf to achieve the goals of the unlawful scheme. Since conspirators are substantively liable for the acts of their co-conspirators, they are equally responsible for statements by their confederates to further the unlawful plan. *Id.* at 510, 476 *A.*2d 1199; *see also State v. Carbone,* 10 *N.J.* 329, 339–40, 91 *A.*2d 571 (1952). The co-conspirator exception to the hearsay rule does not abridge a defendant's right to confront the witnesses against him. *State v. Varona,* 242 *N.J.Super.* 474, 483, 577 *A.*2d 524 (App.Div.) (citing *State v. Boiardo,* 111 *N.J.Super.* 219, 230, 268 *A.*2d 55 (App.Div.), *certif. denied,* 57 *N.J.* 130, 270 *A.*2d 33 (1970), *cert. denied,* 401 *U.S.* 948, 91 *S.Ct.* 931, 28 *L.Ed.*2d 231 (1971)), *certif. denied,* 122 *N.J.* 386, 585 *A.*2d 389 (1990). The exception has long been recognized and upheld, notwithstanding that the opportunity to cross-examine is denied. The circumstances afford a sufficient guarantee of testimonial trustworthiness. *State v. Seaman,* 114 *N.J.Super.* 19, 28, 274 *A.*2d 810 (App.Div.1971), *cert. denied,* 404 *U.S.* 1015, 92 *S.Ct.* 674, 30 *L.Ed.*2d 662 (1972); *see also Dutton v. Evans,* 400 *U.S.* 74, 91 *S.Ct.* 210, 27 *L.Ed.*2d 213 (1970).

Three distinct conditions must be met for statements to qualify for admission under *N.J.R.E.* 803(b)(5). First, the statement must be made in furtherance of the conspiracy. *State v. Rios,* 17 *N.J.* 572, 596, 112 *A.*2d 247 (1955). Second, the statement must have been made in the course of the conspiracy. *State v. Carbone,* 10 *N.J.* at 340, 91 *A.*2d 571. Third, there must be evidence of the existence of the conspiracy and the defendant's relationship to it independent of the hearsay. *State v. Phelps,* 96 *N.J.* at 510, 476 *A.*2d 1199.

We are satisfied that the foundational basis for admission of the recorded statement was satisfied. As we noted earlier in our opinion, the State's theory was that defendant was hired by Wooten and Wilson to avenge the victim's violent assaults on Wooten's sister. Stated somewhat differently, defendant agreed to kill in exchange for money by Wooten and Wilson. We hold that the conspiracy continued until each and every conspiratorial objective and goal was accomplished, including the tender of payment. *See State v. Hunt,* 115 *N.J.* 330, 367–68, 558 *A.*2d 1259 (1989); *State v. Yedwab,* 43 *N.J.Super.* 367, 374, 128 *A.*2d 711 (App.Div.), *certif. denied,* 23 *N.J.* 550, 130 *A.*2d 89 (1957). Because the telephone conversation directly concerned the contemplated payment to defendant, we regard the statement as made in the course and in furtherance of the conspiracy.

We are also convinced that the State presented ample independent proof of the existence of the conspiracy and defendant's participation in the unlawful agreement. We need not recite this evidence in detail. Suffice it to say, the record reeks of defendant's guilt even were we to ignore the taped conversation. It is thus apparent that the existence of the conspiracy and defendant's participation were established wholly apart from the hearsay declarations.

## V.

The final issue is whether the trial court erred by allowing Detective Molisso to testify, over defense counsel's objection, that

he considered defendant a suspect in the shooting by reason of the information given to him by Georgia and Michelle Wooten. The trial court denied defendant's motion for a mistrial, but charged the jury in its instructions at the conclusion of the case:

[y]ou also heard some testimony which came in from the police witnesses, ... regarding the contents of statements taken from persons who are not on trial in this case, co-defendants, and also from other lay witnesses, Michelle Wooten.... That testimony was admitted not in any way for the truth of anything the officer may have disclosed about what was said during the course of taking of those statements by those other parties, but it is only allowed in specifically for the limited purpose to advise you of the actions that were taken by the police officers during their investigation, and you should not consider that testimony in your deliberations for any other purpose other than to let you know that the police did this, took this step, and then they went to the next step. That's it. Anything else is not a proper use of that sort of testimony.

We agree with defendant's contention that the officer's testimony violated *State v. Bankston,* 63 *N.J.* 263, 307 *A.*2d 65, but we find the error harmless.

In *Bankston,* our Supreme Court held that the hearsay rule is not violated when a police officer explains the reason he approached a suspect or went to the scene of the crime by stating that he did so "upon information received." *Id.* at 268, 307 *A.*2d 65. Such testimony is admissible to show that the officer was not acting in an arbitrary manner or to explain his subsequent conduct. *Ibid.* However, when the officer becomes more specific by repeating what some other person told him concerning a crime by the accused, the testimony violates both the hearsay rule and the Sixth Amendment right to be confronted by witnesses. *Id.* at 268–69, 307 *A.*2d 65.

Subsequent decisions have held that the *Bankston* rule is violated "[w]hen the logical implication to be drawn from a witness' testimony is that a nontestifying witness has given the police evidence of the accused's guilt." *State v. Douglas,* 204 *N.J.Super.* 265, 272, 498 *A.*2d 364 (App.Div.), *certif. denied,* 102 *N.J.* 378, 508 *A.*2d 242 (1985); *see also State v. Irving,* 114 *N.J.* 427, 447–48, 555 *A.*2d 575 (1989); *State v. Manning,* 82 *N.J.* 417, 421–22, 413 *A.*2d 605 (1980). In a case in which the State's evidence was considered weak and inconclusive, our Supreme Court has said that a trial

judge's emphatic instruction to the jury to consider such evidence for a limited purpose was not sufficient to eradicate the prejudice emanating from such testimony. *State v. Manning*, 82 *N.J.* at 421, 413 *A.*2d 605.

Detective Molisso's testimony violated *Bankston* and its progeny. The decision in *Bankston* was rendered almost a quarter of a century ago. As we have pointed out, the principles enunciated in that opinion have been reiterated in a myriad of contexts. We are thus mystified with respect to the reason for the prosecutor's meandering into this thicket. A prosecutor should not either in subtle or obvious fashion elicit accusations against the defendant by nontestifying witnesses. Testimony that skirts the edges of impermissible hearsay is neither desirable nor worth the risk of reversal of what may be a well-deserved conviction.

We are nevertheless clearly convinced that the error was harmless beyond a reasonable doubt. The detective's fleeting allusion to the information he received from Georgia and Michelle Wooten did not deny defendant a fair trial. The impermissible testimony occupies a single line of an extensive transcript containing overwhelming evidence of defendant's guilt. In the context of the entire trial, we are satisfied that this minor untoward incident did not have the capacity to produce an unjust result.

Defendant's remaining arguments are clearly without merit and do not require discussion. *R.* 2:11–3(e)(2).

Affirmed.