**NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-2623-17T2

STATE OF NEW JERSEY,

     Plaintiff-Respondent,

v.

SAMUEL LOPEZ,

     Defendant-Appellant.

_____

Argued February 5, 2019 – Decided June 28, 2019

Before Judges Rothstadt and Gilson.

On appeal from the Superior Court of New Jersey, Law Division, Camden County, Indictment No. 16-04-1216.

Douglas R. Helman, Assistant Deputy Public Defender, argued the cause for appellant (Joseph E. Krakora, Public Defender, attorney; Joshua D. Sanders, Assistant Deputy Public Defender, of counsel and on the brief).

Adam D. Klein, Deputy Attorney General, argued the cause for respondent (Gurbir S. Grewal, Attorney General, attorney; Adam D. Klein, of counsel and on the brief).

PER CURIAM

Defendant Samuel Lopez appeals from a judgment of conviction entered after a jury found him guilty of one count of first-degree felony murder, N.J.S.A. 2C-11-3(a)(3); one count of first-degree robbery, N.J.S.A. 2C:15-1(a)(1); one count of second-degree possession of a weapon for an unlawful purpose, N.J.S.A. 2C:39-4(a)(1); and one count of second-degree unlawful possession of a weapon, N.J.S.A. 2C:39:5(b)(1). The trial court sentenced defendant to a forty-five year term of imprisonment subject to the No Early Release Act (NERA), N.J.S.A. 2C:43-7.2.

The charges arose from a robbery and homicide that took place in Camden on the night of September 27, 2015. During the trial, the State introduced text messages under Rule 803(b)(5) between defendant and his co-defendant, Raymond Pagan. On appeal, defendant argues that his conviction should be reversed because he was denied a fair trial. Specifically, he argues that the texts were erroneously admitted and that his sentence is manifestly excessive because the trial court relied upon defendant's constitutional right to maintain his innocence as a justification for imposing a sentence higher than the statutory minimum. We now remand for reconsideration of trial court's decision to admit the text messages because it did not apply the correct test for their admission by considering whether there was sufficient independent evidence of a conspiracy

to admit the text messages. However, we affirm defendant's sentence. Thus, on remand, if the text messages are found to be admissible, defendant's convictions and sentence will remain in place. If, on the other hand, the text messages are found inadmissible, then defendant's convictions and sentences must be vacated and a new trial ordered.

I.

In January 2016, a Camden County grand jury returned Indictment No. 16-04-1216 charging defendant with one count of first-degree felony murder, N.J.S.A. 2C:11-3(a)(3); first-degree murder, N.J.S.A. 2C:11-3(a)(1), (2); one count of first-degree armed robbery, N.J.S.A. 2C:15-1(a)(1); one count of second-degree possession of a weapon for unlawful purpose, N.J.S.A. 2C:39-4(a); and one count of second-degree unlawful possession of weapons, N.J.S.A. 2C:39-5(b). It was undisputed at defendant's trial on these charges and now on appeal that there was no direct identification evidence of defendant's involvement in the robbery and murder. The circumstantial evidence of defendant's guilt was adduced through testimony and by the admission of video footage, audio recordings, and the challenged text messages. We now summarize that evidence to give context to our discussion of the admission of the text messages.

The State's first witness, Officer Sean Donato, testified to being dispatched to the crime scene. He stated that upon arrival, he and the other officers observed the victim was conscious but "writhing in pain" on the ground in a pool of blood with a gunshot wound under his left armpit. Donato confirmed that the police department's computer automated dispatch report indicated that two black male suspects were involved, but he stated that he did not provide this information.[1]

The State then called the victim's mother, G.P. She stated that on the night of September 27, her friend brought her home around 11:00 p.m. As her friend was attempting to leave, G.P. noticed the road was blocked and saw her son in the middle of the street. She said that her son was bleeding, apparently rushed over to him, and he told her that "they tried to rob [him]," at which point she called the police. The mother testified further that she saw one black male in a car and another outside near her son but noted that they were only looking at him on the ground and left when she arrived.

The State's next witness was M.M., the victim's girlfriend at the time of his death. She testified that she was not with the victim during the day and was already asleep by 11:00 p.m. She stated that his mother called twice and the

---

[1] Neither defendant nor his codefendant are black.

A-2623-17T2

second call woke her up, at which point she saw a text message from the victim sent at approximately 11:00 p.m. telling her that he loved her. M.M. also testified that she received a text from the victim telling her that he "had beaten up two guys" earlier in the day.

The State then called Z.A., one of the victim's and G.P.'s neighbor. She testified that at around 11:15 p.m. on September 27, she was at home with her father-in-law, J.C. and her partner's nephew. She was in the kitchen when she saw two people walking up the street wearing dark hoodies; she could not see their faces. She watched them go into an alley and did not see them emerge or anything else that night. Z.A. testified that she spoke to the police two days later and gave a statement. In her statement, she noted that the individuals went into the alley together and one was bigger than the other.

J.C., the father-in-law of Z.A., testified that he was upstairs when he heard a noise below. He opened the window and saw three men, two of whom were hugging or grabbing the third who was on the street. He noted it was dark and could not distinguish exactly what was happening. He stated that at some point, two of the men started running and the third got up and was stumbling. He testified that the next morning, he saw a "thing of blood" on the street around where he saw the men from the night before.

A-2623-17T2

The parties then stipulated to several facts related to the results of the prosecutor's DNA testing of blood samples, which they agreed came only from the victim, ballistics results, the injuries to the victim, and to his cause of death being from a gunshot wound to the chest that was not taken at close range. The parties also stipulated that the phone number for the party to text messages secured from defendant's phone, which the State was seeking to admit, belonged to defendant's co-defendant, Pagan.

Detective Katherine Scully, a member of the prosecutor's High Tech Crimes Unit testified about her investigation into the LG cell phone that another detective, Sherman Hopkins, turned over for forensic analysis. She testified that she was able to retrieve text messages from the phone and generate a corresponding report that displayed the messages.

Detective Sean Miller, a former member of the police department's Shooting Response Team testified about his September 27 encounter with defendant after being dispatched to a hospital in response to its report that it was treating defendant as a gunshot victim. There was no dispute that defendant was there having sustained a gunshot wound to the upper part of his left thigh.

Miller testified that he located defendant in the trauma room and when first speaking with defendant, he was hesitant, fidgety, and scared. An audio

recording of his interaction with defendant was played for the jury. During the exchange, defendant first stated he was near the vicinity of where the incident occurred when he was robbed by two men. He said he was shot because the only things he had in his possession were cigarettes, twenty dollars, and his LG phone, but the perpetrators did not take anything. Miller asked if defendant shot himself but defendant repeatedly stated he did not have a gun. Defendant then stated that he got shot near a different location while walking around after an argument with his girlfriend. He told detectives that he did not know where his phone was or his phone number, although his phone was located in the trauma room and taken by the police.

After the recording was played, Miller resumed his testimony and stated that city had law enforcement-monitored cameras at cross-streets that could determine the location of a shooting. He stated that he sent other officers to investigate other signs of crime at the places defendant indicated, but no such evidence was found. Miller testified that he asked defendant if he shot himself because of the evasive answers that he received. He also confirmed that he reviewed footage from hospital cameras of defendant walking into the hospital at 11:39 p.m. He confirmed that he took defendant's cell phone and his jeans as evidence, but did not seize defendant's blue sneakers. When shown a pair of

7

blue sneakers marked for identification, Miller confirmed those were the blue sneakers he saw with defendant's clothing.

Officer Lissandra Sime testified that she was also dispatched to the hospital to get a report from defendant while Detective Miller was there. She stated that defendant told her that he was walking and was approached by two males in masks and they shot him.

The State then called N.T., Pagan's girlfriend at the time of the September 27 incident. She testified that Pagan called her that night to drive one of his friends to the hospital. While she had not previously met the friend, she stated that she took him to the hospital because he had been shot. After reviewing the statement she previously gave to the police on December 1, 2015, she said that while inside her car, the friend was on the phone, but she did not know with whom and she heard him say that "somebody got shot and that he did know, the guy was dead."

Y.P., defendant's former girlfriend, testified that on September 27, she was with defendant at his mother's house and then he left to buy food. She stated that later that night, she received a phone call that he had been shot and met him at the hospital. She added that she and defendant were not fighting that night.

Detective Sherman Hopkins, who was assigned to take over the victim's homicide investigation on September 28, testified that he made contact with the victim's mother, girlfriend, and best friend. While searching the surrounding area, he found and followed small droplets of blood, which led to a larger pool of blood. Hopkins further testified that he canvassed the area for surveillance cameras and attempted to retrieve video from different places, ultimately obtaining footage from the immediate area from a liquor store, a restaurant, and a church.

The video recordings depicted whom the police believed were defendant and Pagan near the victim's location and fleeing from the scene after the shooting. The footage from the liquor store depicted two people standing nearby, both wearing black-hooded sweatshirts and gloves. One of the subjects wore reflective blue sneakers, while the other had a white emblem on his sweatshirt. The video showed the two men behind bushes across the street from the store until they walk away. Still images of the blue sneakers and white gloves were taken from the video and admitted over defendant's objection.

The restaurant's surveillance tape depicted the same two individuals pacing back and forth and then walking into a parking lot before the victim appears on the tape. The victim is then seen crossing the street and is followed

by the other two men. The two are seen pulling their hoods over their faces so that they were almost completely covered. The video footage from the church's camera, taken after the victim was shot, showed the two men running away from the area.

Hopkins also testified that he spoke to defendant at his home and an audio recording of that discussion was played for the jury. On the recording defendant informed Hopkins that a stranger brought him to the hospital and that prior to being shot, he was "walking some steam off" from an argument that he had with his girlfriend at his house. He added that he was in the area of the incident at the time. He said that the two men who robbed him were Hispanic, concealed their faces, and had a silver revolver. He further explained that he was wearing a tank top, black jeans, and blue sneakers at the time and did not have anything for the men to take.[2] Defendant also said he was going to smoke with a friend and that he ordered food for delivery at some point before leaving his house. Defendant stated that he did not kill anyone and reiterated that the police were questioning the wrong person.

In his statement, although defendant initially said that he was wearing black jeans and blue sneakers when he was shot, he later stated that most of his

---

[2] Later, however, Hopkins stated that defendant said his phone was taken.

sneakers were yellow after Hopkins told defendant that the surveillance tapes police had secured showed one of the two perpetrators wearing the same clothes he was wearing at the hospital.

Hopkins then testified to the contents of the text messages retrieved from defendant's cell phone. He did so over defendant's continued objection. The text messages contained indications that the two participants were planning on securing a gun and committing a robbery.

Detective Joseph Gurcik of the prosecutor's Crime Scene Investigation Unit testified that during a search of defendant's home on September 30, 2015, four pairs of shoes were seized, including the pair of blue sneakers that were admitted into evidence. No blood was found on the shoes.

After the State rested, defendant moved for the charges against him to be dismissed. He specifically contended that there was no evidence connecting him to the case, noting that the neighbors did not identify him and did not hear any gunshots. The State recognized that its case was based on circumstantial evidence, but argued that there were videos from various areas showing hooded individuals and that Pagan's girlfriend picked defendant up to go to the hospital. It added that defendant repeatedly gave conflicting information. The trial court

denied defendant's motion, finding sufficient evidence for the jury to determine that he was involved in the robbery and homicide.

Following this denial, defendant informed the court of his decision not to testify. Defendant called Hopkins as his only witness. Hopkins testified that none of the videos or screen shots were shown to the State's non-law enforcement witnesses, but noted that the hospital video may have been shown to Pagan's girlfriend. He stated that there were no bullets or guns recovered from defendant's house. He also stated that he spoke to an individual who bought the victim's cell phone from a drug addict.

After the trial court denied defendant's motion for a mistrial, in which he contended it was in error for the court to admit the videos and still photographs that he described as enhanced, the attorneys presented their closing arguments, the trial court instructed the jury, and it began its deliberations.

During its deliberation, the jury asked to see the text messages between defendant and Pagan. The prosecutor reread the texts. Initially, the jury was unable to reach a decision on the robbery charge and it was instructed to continue its deliberations until a verdict was reached. Eventually, the jury unanimously found defendant guilty of felony murder, armed robbery, possession of a weapon

for unlawful purpose, and unlawful possession of a weapon but not of murder and the lesser-included offense of manslaughter.

The trial court later sentenced defendant. This appeal followed.

On appeal, defendant specifically argues the following two points.

POINT I

[DEFENDANT] WAS DENIED A FAIR TRIAL BY THE COURT'S ERRONEOUS ADMISSION OF TEXT MESSAGES ATTRIBUTED TO "RAY."

POINT II

THE SENTENCE IS MANIFESTLY EXCESSIVE AS THE COURT USED [DEFENDANT'S] CONSTITUTIONAL RIGHT TO MAINTAIN HIS INNOCENCE AS A JUSTIFICATION FOR EXCEEDING THE MINIMUM SENTENCE IN THIS MATTER.

II.

We turn first to defendant's contentions about the text messages. When the State offered the text messages retrieved from his phone, defendant objected. He argued that messages from the phone on the days preceding September 27 were not relevant and would "fall[] into [Rule] 404(b) territory" because of their highly prejudicial nature. Defendant admitted there were relevant text messages on September 27. In opposition, the State emphasized that the texts from September 27 were between defendant and Pagan and were relevant because

[it was] not alleging that [defendant and Pagan] committed any other robberies. [It was] alleging that they were conspiring to commit a robbery at some point, which they ultimately did on September 27th. And there's these text messages setting up what they need. . . . [T]hey're talking about getting wheels, getting things, just talk that seems to indicate that they were putting the plan in motion to go out on September 27th to commit the robbery. . . . These are tied into what they're talking about the days leading up to the murder.

The trial court ruled that the text messages from September 26 and 27 would be admitted but "anything prior to the 26th . . . would not be relevant. It really would get into [Rule] 404(b). However . . . from the day before through the 27th would be relevant."

As already noted, the text messages were read to the jury during Hopkins testimony for the State. He read the following texts into the record:

Pagan (September 26, 2015, 11:08:16 p.m.): Bro, what's going on.

Defendant (September 26, 2015, 11:08:56 p.m.): What's poppin'.

Pagan (September 26, 2015, 11:10:33 p.m.): We need to make a mark. I got an idea.

Defendant (September 26, 2015, 11:11:06 p.m.): Where you wanna hit.

Pagan (September 26, 2015, 11:12:32 p.m.): Everywhere, just don't know where to start, I wanna get a hustler.

Pagan (September 26, 2015, 11:14:23 p.m.): I got us for the morning, all day. Can you think of what to do now, I'm down with whatever you want to do.

Defendant (September 26, 2015, 11:15:45 p.m.): That's lightweight, my boy, but it's whatever, feel me. But I got a couple of jobs too, word is bond. I'm just still getting info and the goons, but you know we got the thangs [sic] on deck, ND I'm a be back out in the hood in a little. I'm just watching this movie.

Pagan (September 26, 2015, 11:20:35 p.m.): I got a goon that's down and you need to tell me in person about the jobs and LMK when you get home I got something for us to put together to do the jobs in the a.m.

Defendant (September 26, 2015, 11:22:04 p.m.): SNM YKTS, I'm out here, feel me ND, this movie 'bout to end. In a little, so I'll be around B.

Pagan (September 26, 2015, 11:22:10 p.m.): We should buy them two things tomorrow after we come home from work. You said $250 for both of them, right.

Pagan (September 26, 2015, 11:23:11 p.m.): K HMU when you get out here.

Defendant (September 26, 2015, 11:23:53 p.m.): I gotta talk to the person 'bout it, ND if he still got the SHXT or if he got new ND bigger SHXT. Feel me.

Defendant (September 26, 2015, 11:24:24 p.m.): Most def he got better SHXT though.

15

A-2623-17T2

Pagan (September 27, 2015, 12:45:14 p.m.): I wanted to bag B and get fiends for everything. Now out north with it or that AV hustler.

Defendant (September 27, 2015, 3:03:43 p.m.): We gonna check that AV SHXT today, ARD.

Pagan (September 27, 2015, 3:37:24 p.m.): Yeah, I'm a get in shower. I'll hit you up soon.

Defendant (September 27, 2015, 3:38:01 p.m.): ARD say less, bra, bra, HMU.

Defendant (September 27, 2015, 7:40:58 p.m.): Yo, you good.

Pagan (September 27, 2015, 7:47:58 p.m.): I'm about to go over there. I'm in Blackwood now.

Defendant (September 27, 2015, 7:48:19 p.m.): Ta bien (phonetic).

Pagan (September 27, 2015, 8:52:55 p.m.): I'll be there in 15 MIN, you still down, right.

Pagan (September 27, 2015, 8:59:22 p.m.): I'll be there in five, you ready.

Defendant (September 27, 2015, 9:03:46 p.m.): ARD.

Pagan (September 27, 2015, 9:04:01 p.m.): I'm here.

Pagan (September 27, 2015, 9:04:18 p.m.): I gotta get the thing. It's nearby.

A-2623-17T2

On appeal, defendant challenges the text messages' admission and argues that the trial court failed to engage in the proper analysis for admission of the text messages because it only considered whether they were relevant. If the court conducted the proper analysis, defendant believes that the court could not have concluded that the State met its burden for admission of the text messages. Relying upon the requirements for admission under Rule 803(b)(5), statements of a co-conspirator, and our holding in State v. Harris, 298 N.J. Super. 478 (App. Div. 1997), defendant argues that the State failed to demonstrate that the messages were made in furtherance of a conspiracy, or during the conspiracy, and argues that there was insufficient non-hearsay evidence of a conspiracy and defendant's relationship to it to warrant admission of the text messages. Accordingly, he asserts that not only did the State "fail[] to offer even a scintilla of evidence" of a conspiracy and his involvement in one, but also its proffer that the texts show a conspiracy is neither substantial nor sufficient for admission. In the alternative, he argues that even if the text messages were admissible as non-hearsay, the trial court was required to provide a limiting instruction to the jury that it should not have considered the statements in the texts for their truth.

We begin our review by acknowledging, "the admissibility of evidence at trial is left to 'the sound discretion of the trial court.'" State v. Green, 236 N.J.

71, 80-81 (2018) (quoting State v. Willis, 225 N.J. 85, 96 (2016)).  We therefore review "[a] trial court's evidentiary ruling . . . on appeal for abuse of discretion." Id. at 81.  In doing so, we "may not substitute [our] own conclusions regarding the evidence, even in a 'close' case."  State v. Jefferson, 413 N.J. Super. 344, 349 (App. Div. 2010) (quoting State v. Locurto, 157 N.J. 463, 471 (1999)). "'[A]bsent a showing . . . [that] there has been a clear error of judgment,' an evidentiary ruling will stand."  State v. Sessoms, 413 N.J. Super. 338, 342 (App. Div. 2010) (alterations in original) (quoting State v. Brown, 170 N.J. 138, 147 (2001)).

Applying this standard, we conclude that the trial court mistakenly exercised its discretion by not applying the correct standard to the admission of the text messages.  Pagan's text messages were clearly hearsay statements. Hearsay "is a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted."  N.J.R.E. 801(c).  Non-testimonial statements may be admitted to the extent they fall into a recognized exception to the hearsay rule.  See State v. Weaver, 219 N.J. 131, 151 (2014).

Relevant to the present case, a statement "is not excluded by the hearsay rule if it was 'made at the time the party and the declarant were participating in

a plan to commit a crime . . . and . . . made [it] in furtherance of that plan.'" State v. Cagno, 211 N.J. 488, 529 (2012) (quoting N.J.R.E. 803(b)(5)). In order to admit a statement of a co-conspirator into evidence, the State must prove that "(1) the statement was 'made in furtherance of the conspiracy'; (2) the statement was 'made during the course of the conspiracy'; and (3) there is 'evidence, independent of the hearsay, of the existence of the conspiracy and [the] defendant's relationship to it.'" Id. at 529-30 (alteration in original) (quoting State v. Taccetta, 301 N.J. Super. 227, 251 (App. Div. 1997)). See also Harris, 298 N.J. Super. at 488.

Before admitting such statements, a "trial court must make a preliminary determination of whether there is independent proof of the conspiracy." State v. Savage, 172 N.J. 374, 403 (2002). See also N.J.R.E. 104(a) ("[w]hen the . . . admissibility of evidence . . . is subject to a condition, and the fulfillment of the condition is in issue, that issue is to be determined by the judge"). The independent evidence can take various forms and "must be substantial enough to engender a strong belief in the existence of the conspiracy and of the defendant's participation." State v. Phelps, 96 N.J. 500, 511 (1984).

A court must determine whether substantial independent proof exists even if defendant is not charged with a conspiracy under N.J.S.A. 2C:5-2. See State

v. Clausell, 121 N.J. 298, 336-37 (1990); State v. Farthing, 331 N.J. Super. 58, 82-83 (App. Div. 2000); State v. Baluch, 341 N.J. Super. 141, 183 (App. Div. 2001). Even without a conspiracy charge, "a trial court must find that [the statements] were made in furtherance of and during the course of the conspiracy and that 'a fair preponderance of evidence' independent of the hearsay statements supports the existence of the conspiracy and of defendant's relationship to it." Clausell, 121 N.J. at 337 (quoting Phelps, 96 N.J. at 509-10).

In reaching its decision to admit the text messages in this case, the trial court did not conduct the proper analysis. The court limited its analysis to whether the texts were relevant and excluded those that it felt might raise N.J.R.E. 404 (b) concerns about other crime evidence. It made no determination as to whether there existed substantial independent evidence of defendant's participation in the charged offenses.

Under these circumstances, we are constrained to remand the matter to the trial court for reconsideration of its ruling under the proper test. As noted, prior to the jury having the text messages read to it, there was testimony and other evidence relating to the robbery and shooting. If the court determines that the evidence constituted substantial independent non-hearsay evidence of defendant's participation in a conspiracy to commit the crimes, the defendant's

conviction should remain undisturbed. If the court determines otherwise, then it must enter an order vacating the conviction and granting defendant a new trial at which the text messages will not be admitted.

### III.

Turning to defendant's sentence, we reach a different conclusion. Defendant argues that his sentence is manifestly excessive because he believes that the trial court relied upon his constitutional right not to testify as a justification to exceed the minimum sentence. He maintains this was his first adult conviction and the court unconstitutionally "punished" him for maintaining his innocence. As such, a remand for resentencing is required. We disagree.

On November 17, 2017, the parties appeared before the trial court for sentencing. The State requested a sentence of fifty-two-and-a-half-years subject to NERA and noted that first-degree felony murder carried, at minimum, a thirty-year term of imprisonment. It attributed defendant's lack of an adult record to his age and emphasized his demonstrated lack of respect for the criminal justice system. With regard to the text messages, the State argued that they demonstrated defendant was not under Pagan's influence and sought to commit a crime even more significant than Pagan originally suggested. Because

A-2623-17T2

it contended that defendant was part of the plan from the beginning, no mitigating factor should apply. It argued for the application of aggravating factors three, N.J.S.A. 2C:44-1(a)(3), ("[t]he risk that defendant would commit another offense"); six, N.J.S.A. 2C:44-1(a)(6), ("[t]he extent of [his] prior criminal record and the seriousness of the offenses of which he has been convicted"); and nine, N.J.S.A. 2C:44-1(a)(9), ("[t]he need for deterring [him] and others from violating the law").

Defendant argued for the minimum sentence of thirty years. He contended that mitigating factor eight, N.J.S.A. 2C:44-1(b)(8) ("defendant's conduct was the result of circumstances unlikely to recur"), applied given his age and that he was "substantially influenced by . . . Pagan." Defendant addressed the court and maintained his innocence, assuring his family that he would be back soon and "walking home."

The trial court found aggravating factors three, six, and nine. The court explained that it weighed factors three and nine heavily and found defendant's juvenile record and the fact that as soon as defendant turned eighteen, he engaged in a serious crime as justification for its decision. The court declined to find mitigating factor eight, given defendant's prior record and the seriousness of the crime as his first adult offense. The court also was "impressed" by the

texts as they demonstrated that defendant was not imposed upon by Pagan.  It declined to find mitigating factor thirteen, N.J.S.A. 2C:44-1(b)(13) ("[t]he conduct of a youthful defendant was substantially influenced by another person more mature than the defendant"), because the court thought defendant "ha[d] no maturity.  He is the kind of person that frankly has to be kept off the street because he doesn't seem to recognize what his responsibilities are to society and to other people."

The trial court merged the robbery charge and the possession for an unlawful purpose charge into the felony murder charge, and sentenced defendant to a forty-five year term subject to NERA for the felony murder and a concurrent seven-year prison term with a three-and-one-half year period of parole ineligibility for the unlawful possession of a weapon.

We review a court's sentencing decision under an abuse of discretion standard.  State v. Fuentes, 217 N.J. 57, 70 (2014).  In our review, we must determine whether:

> (1) the sentencing guidelines were violated; (2) the aggravating and mitigating factors found by the sentencing court were not based upon competent and credible evidence in the record; or (3) "the application of the guidelines to the facts of [the] case makes the sentence clearly unreasonable so as to shock the judicial conscience."

> [Ibid. (alteration in original) (quoting State v. Roth, 95 N.J. 334, 364-65 (1984)).]

We have considered defendant's contention in light of the record and applicable legal principles and conclude it is without sufficient merit to warrant discussion in a written opinion. R. 2:11-3(e)(2). We affirm substantially for the reasons the court expressed at sentencing. We are satisfied that the court did not violate the sentencing guidelines and the record amply supports its findings on aggravating and mitigating factors. The sentence is clearly reasonable and does not shock our judicial conscience. We add only the following brief comments.

At the time of the offenses, defendant was eighteen-years-old with substantial previous contact with the criminal justice system, as evidenced by his juvenile record that included numerous adjudications. When considering defendant's "maturity," the trial court properly looked at the totality of the circumstances to correctly conclude that mitigating factor thirteen did not apply. See State v. Torres, 313 N.J. Super. 129, 162-64 (affirming the trial court's omission of mitigating factor thirteen where a sixteen-year-old defendant planned and committed a robbery with his co-defendant and executed a jewelry store owner).

Also, contrary to defendant's contentions, the trial court did not refer at all to defendant's refusal to admit his guilt to the charged offenses as the basis for his sentence that it imposed. Rather, the trial court properly relied upon the appropriate sentencing factors and concluded within its discretion that a more severe sentence than the minimum was warranted. To the extent the trial court commented upon defendant's demeanor and his statement to the court, its "brief allusion to defendant's failure to candidly admit his guilt does not require a reversal." State v. Marks, 201 N.J. Super. 514, 540 (App. Div. 1985).

Affirmed in a part; remanded in part for further proceedings consistent with our opinion. We do not retain jurisdiction.

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION

25                                                                    A-2623-17T2