NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO.  A-2102-17T2

STATE OF NEW JERSEY,

     Plaintiff-Respondent,

v.

MARQUIS ARMSTRONG,

     Defendant-Appellant.

_____

> **APPROVED FOR PUBLICATION**
>
> **JUNE 2, 2020**
>
> **APPELLATE DIVISION**

Argued December 9, 2019 – Decided June 2, 2020

Before Judges Messano, Ostrer and Susswein.

On appeal from the State of New Jersey, Law Division, Essex County, Indictment No. 15-05-0932.

Zachary Gilbert Markarian, Assistant Deputy Public Defender, argued the cause for appellant (Joseph E. Krakora, Public Defender, attorney; Michael Timothy Denny, Assistant Deputy Public Defender, of counsel and on the briefs; Zachary Gilbert Markarian, on the briefs).

Adam David Klein, Deputy Attorney General, argued the cause for respondent (Gurbir S. Grewal, Attorney General, attorney; Adam David Klein, of counsel and on the briefs).

The opinion of the court was delivered by

MESSANO, P.J.A.D.

An Essex County grand jury indicted defendant Marquis Armstrong for the September 4, 2014 murder of Rhasan Heath. Defendant filed a pre-trial motion to suppress "evidence seized without a communications data warrant [(CDW)]." At issue were text messages defendant sent to Nache DeWitt, his former girlfriend and with whom he fathered a daughter. The judge denied the motion to suppress without conducting an evidentiary hearing.

Defendant subsequently pled guilty during trial to the lesser-included offense of first-degree aggravated manslaughter, N.J.S.A. 2C:11-4(a)(1), and second-degree unlawful possession of a weapon, N.J.S.A. 2C:39-5(b). The judge sentenced defendant to a twenty-five-year term of imprisonment subject to the No Early Release Act, N.J.S.A. 2C:43-7.2, on the aggravated manslaughter conviction; and, a concurrent eight-year term on the weapons offense, with a forty-two-month parole disqualifier pursuant to the Graves Act, N.J.S.A. 2C:43-6(c).

I.

Because there was no evidentiary hearing held on the suppression motion, we recite some of the trial evidence to place the issue in context.

Defendant and DeWitt ended their relationship in April 2014. However, months later, on September 2, the two were heading home together from a family picnic they had attended. Heath, DeWitt's current boyfriend, bore some

A-2102-17T2

animosity toward defendant, and, when he saw them together, he began driving aggressively and pulled his car alongside theirs at a red light. The two men screamed taunts at each other until the light changed, when they both drove off.

The following evening, DeWitt was with Heath at his sister's apartment when she began receiving what the State contended were threatening texts and calls from defendant on her cellphone. She did not respond to the texts or answer the calls. In the last text, at 11:37 p.m., defendant told DeWitt he was "[ab]out to get crazy." In what the State alleged was a fit of jealous pique, defendant went to Heath's sister's apartment to search for DeWitt. He saw her car parked outside and waited. As DeWitt left with her daughter and walked to her car shortly after midnight, defendant emerged, and an altercation ensued. Shortly thereafter, Heath came outside, and defendant began shooting at him. Heath ran into the street, only to be struck by an oncoming car. As Heath lay at the curb, defendant approached and shot him three times, killing him.

At the pre-trial hearing on defendant's suppression motion, the State argued that defendant lacked standing to suppress text messages police recovered from DeWitt's phone, allegedly with her consent. Alternatively, the State contended defendant had no expectation of privacy in those messages. Defendant argued that he had standing under State v. Alston, 88 N.J. 211, 228

3

(1981), and its progeny to seek suppression of the messages, and the State failed to produce any proof that DeWitt consented to the search of her phone.[1]

In a very brief oral opinion, the judge held "defendant does not have standing to challenge the information in a third party's phone, nor has any case law . . . support[ed] that proposition."  Furthermore, the judge determined that "even if [] defendant were to have standing . . . there is no . . . logical argument that can be made that anyone would have a reasonable expectation of privacy in communications that they put out over . . . a . . . cell phone."  He denied defendant's motion to suppress.

## II.

Defendant raises the following point on appeal:

POINT I

THE TRIAL COURT ERRED BY RULING THAT THE DEFENDANT DID NOT HAVE STANDING TO CHALLE[N]GE TEXT MESSAGES HE SENT TO A WITNESS AND THAT THERE WAS NO REASONABLE EXPECTATION OF PRIVACY IN THE CONTENT OF THE MESSAGES.

---

[1] The State did not produce the consent form signed by DeWitt in pre-trial discovery.  However, it did supply the form at some point during trial, although it is unclear from the record exactly when.  A copy of the form is in the appellate record.  The form is dated September 4, 2014, the date of the homicide.  DeWitt testified at trial that she gave police consent to search her phone.

A-2102-17T2

> A. Armstrong Had Standing to Challenge the Seizure Because He Had a Participatory Interest in the Text Messages.
>
> B. Armstrong Had a Reasonable Expectation of Privacy in His Personal Communications With the Mother of His Child.

Defendant contends that the trial court's errors compel reversal and a remand for a new trial. However, that overlooks any substantive consideration of the State's assertion that DeWitt consented to the search of her phone. Alternatively, defendant urges us to remand for a hearing at which the State "can attempt to prove whether the evidence is otherwise admissible under an exception to the warrant requirement." In other words, defendant argues that we should require the State prove at a remand hearing whether police validly obtained DeWitt's consent.

We have considered this alternative argument in light of the record and applicable legal principles. We conclude defendant lacked standing to challenge the recovery of text messages from DeWitt's phone, to which he had no reasonable expectation of privacy, and affirm the denial of his motion to suppress.

A.

Our Supreme Court has

5

repeatedly reaffirmed that, under Article I, Paragraph 7 of the New Jersey Constitution, "a criminal defendant is entitled to bring a motion to suppress evidence obtained in an unlawful search and seizure if he has a proprietary, possessory or participatory interest in either the place searched or the property seized."

[State v. Randolph, 228 N.J. 566, 581–82 (2017) (quoting Alston, 88 N.J. at 228).][2]

"[T]he State bears the burden of showing that defendant has no proprietary, possessory, or participatory interest in either the place searched or the property seized." Randolph, 228 N.J. at 582 (citing State v. Brown, 216 N.J. 508, 528 (2014)).

Our "automatic standing rule[,]" State v. Lamb, 218 N.J. 300, 313 (2014), "deviates from the federal approach, which requires that 'a person alleging a Fourth Amendment violation . . . establish that law enforcement officials violated "an expectation of privacy" that he possessed in the place searched or item seized.'" Randolph, 228 N.J. at 582 (quoting State v. Johnson, 193 N.J. 528, 542 (2008)). Analysis of such an expectation rests on two inquiries: first, "whether the individual, by his [or her] conduct, has 'exhibited an actual (subjective) expectation of privacy'"; and second, "whether

---

[2] "The phrase 'proprietary, possessory[,] or participatory interest' in relation to standing derives in New Jersey from its original expression in Maguire, Evidence of Guilt 216 (1959)." State v. Curry, 109 N.J. 1, 9 (1987) (citations omitted).

the individuals . . . expectation . . . is 'one that society is prepared to recognize as "reasonable[.]"'" Smith v. Maryland, 442 U.S. 735, 740 (1979) (citing Katz v. United States, 389 U.S. 347, 361 (1967) (Harlan, J., concurring)).

Our benchmark for standing incorporates, but is not limited to, "the legitimate expectation of privacy standard[.]" State v. Shaw, 237 N.J. 588, 616 (2019) (citing Johnson, 193 N.J. at 543). In Randolph, the Court cautioned that for physical spaces where an expectation of privacy has "historically" existed, courts need not "engage in an additional reasonable expectation of privacy analysis as a supplement to our standing rule[,]" although it is appropriate to consider a defendant's reasonable expectation of privacy in determining his standing to assert constitutional claims "in a novel class of objects or category of places[.]" 228 N.J. at 583–84.

B.

Defendant argues without citing any authority that text messages are "direct, one-on-one communications . . . emblematic of the private spaces" secured by the Fourth Amendment and our constitution. He contends it was error for the judge to engage in any expectation of privacy analysis. We disagree.

Our courts have not specifically addressed whether the sender of a text message maintains a reasonable expectation of privacy after the message is

delivered to a device the sender does not possess, own or control, and after the sender has relinquished any ability to limit distribution of the text message to another. Other courts that follow traditional Fourth Amendment standing jurisprudence have consistently concluded he does not. As Professor LaFave has said in considering the issue in the context of more traditional forms of communication, "The standing of the sender, to the extent it is based solely upon the fact of his being the sender, terminates once delivery of the goods has been made." 6 Wayne R. LaFave, Search and Seizure, § 11.3(f) (5th ed. 2012).

Some courts have focused their analysis on the device itself, and the defendant's lack of physical control over it.[3] For example, in United States v. Stringer, the court held that the defendant lacked standing to challenge a search of a juvenile victim's cell phone containing pornographic images. 739 F.3d 391, 396 (8th Cir. 2014); see also United States v. McHenry, 849 F.3d 699, 706 (8th Cir. 2017) (citing Stringer and expressing doubt that the defendant had standing to assert a Fourth Amendment right in a cell phone registered to another and being used by another while being tracked on GPS); Christensen v. Cty. of Boone, 483 F.3d 454, 461 (7th Cir. 2007) (holding there

---

[3] In Riley v. California, the United States Supreme Court clearly held that absent other recognized exceptions to the warrant requirement, the Fourth Amendment requires police to obtain a search warrant prior to searching the contents of a cell phone seized incident to arrest. 573 U.S. 373, 401–02 (2014).

was no Fourth Amendment violation when police searched a cell phone belonging to another person); United States v. Gatson, 744 Fed. Appx. 97, 100 (3rd Cir. 2018) (citing Stringer and holding the defendant lacked standing to assert suppression of data on cellphones for which the government obtained a CDW because he never "owned, possessed, used, or had any privacy interest" in one phone and the second phone was owned by another person).

In State v. Patino, presented with factual circumstances very similar to ours, the Rhode Island Supreme Court considered "whether a person ha[d] a reasonable expectation of privacy in . . . messages stored in a cell phone belonging to, or possessed by, another person." 93 A.3d 40, 55 (R.I. 2014). Surveying decisions from other jurisdictions, the court found "the most important factor . . . is from whose phone the messages are accessed." Ibid. The court reasoned, "a cell phone user retains control over what becomes of the content on his or her phone, but entirely loses control of the messages contained on the phone of another." Id. at 57. The court concluded that the defendant "had no reasonable expectation of privacy, and thus no standing to challenge the search and seizure of [his girlfriend's] phone, its contents, and all derivatives therefrom[,]" even though "there exist[ed] an identical copy of the messages on the [defendant's] phone." Ibid.; see also State v. Sexton, 159

A.3d 335, 344 (Me. 2017) (holding the defendant lacked standing to suppress evidence obtained from the cellphone records of his girlfriend).

In State v. Tentoni, the court held the defendant lacked an objectively reasonable expectation of privacy in text messages that he sent and that were discovered through a warrantless search of the recipient's phone. 871 N.W.2d 285, 290 (Wis. Ct. App. 2015). The court found it critical that the defendant had no property interest in the recipient's phone, control over the phone, or any ability to exclude others from accessing the messages he had sent to recipient and were now stored in the recipient's phone. Ibid.

Other courts, while still focusing on traditional property concepts, have nonetheless recognized a defendant's standing to seek suppression of messages retrieved from a device, even though the defendant never asserted an ownership or possessory interest in the device. For example, in United States v. Mompie, distinguishing Stringer, the court upheld the defendant's standing to challenge a search pursuant to a warrant of a cellphone recovered from her person, and cellphones and computers in her rental car. 216 F. Supp. 3d. 944, 953 (S.D. Ind. 2016). In Commonwealth v. Cruzado, the court held that the defendant had standing to challenge the seizure of a cellphone found near him, but which he did not own, because he had a "possessory interest in it[,]" and

the government asserted the cellphone was the defendant's. 103 N.E.3d 732, 740 (Mass. 2018).

As to other forms of communication, many other courts have held that a defendant's expectation of privacy terminates after a message is sent, not because he lacked physical control or possession of the receiving device, but rather because the defendant lost any ability to control what happened to the data itself once in the hands of another. See, e.g., United States v. Jacobsen, 466 U.S. 109, 117 (1984) ("[W]hen an individual reveals private information to another," a reasonable expectation of privacy no longer exists because "he assumes the risk that his confidant will reveal that information to the authorities[.]"); United States v. King, 55 F.3d 1193, 1196 (6th Cir. 1995) ("[T]he sender's expectation of privacy ordinarily terminates upon delivery[,] (citing 4 Wayne R. LaFave, Search and Seizure, § 11.3(f) (1987)) (citations omitted) . . . even though the sender may have instructed the recipient to keep the letters private." (quoting United States v. Williams, 951 F.2d 853, 856 (7th Cir. 1992)).

In United States v. Meriwether, the defendant claimed his Fourth Amendment rights were violated when his telephone number was seized from a message sent to a co-conspirator's text message pager. 917 F.2d 955, 957 (6th Cir. 1990). The Sixth Circuit concluded defendant lacked standing,

11

holding that "[a] party sending a message to a pager has expressed his subjective desire to preserve his privacy even less than" he would be if he were speaking on the telephone. Id. at 959. The court observed that whereas in a phone conversation the speaker may discern the identity of the listener, by sending a text message, the sender has no way of knowing who is on the receiving end. Ibid. As such, the court noted, the sender "runs the risk that either the owner or someone in possession of the pager will disclose the contents of his message." Ibid. Finding the "actual confidentiality of a message to a pager . . . quite uncertain," the court "decline[d] to protect [the defendant's] misplaced trust[.]" Ibid.

In United States v. Jones, the defendants "used text message pagers to communicate with each another." 149 Fed. Appx. 954, 957 (11th Cir. 2005). When one co-conspirator entered a plea agreement and agreed to testify to the contents of the text messages, his co-conspirators moved to suppress the records. Id. at 958. Reversing the district court's grant of the motion, the Eleventh Circuit held that the co-conspirators did not have a reasonable expectation of privacy in their text communications. Id. at 957. The court analogized text messages to e-mails, noting that "an individual sending an e-mail loses 'a legitimate expectation of privacy in an e-mail that had already reached its recipient.'" Id. at 959 (quoting Guest v. Leis, 255 F.3d 325, 333

12

(6th Cir. 2001) (citations omitted)). The court also noted, "once the transmissions are received by another person, the transmitter no longer controls [their] destiny." Ibid. (quoting United States v. Maxwell, 45 M.J. 406, 416 (C.A.A.F. 1996)); see also State v. Carle, 337 P.3d 904, 908–09 (Or. Ct. App. 2014) (the defendant had no reasonable expectation of privacy in text message sent to another and found on the other person's phone, even though she "'implicitly entrusted'" the message to the other person and "did not expect law enforcement to see the message").

In Guest, the Sixth Circuit drew attention to the distinction between a reasonable expectation of privacy in the device itself, as opposed to the data contained on the device. In that case, the plaintiffs alleged law enforcement's seizure of the contents of two electronic bulletin board systems violated their rights under the Fourth Amendment. The defendants asserted that plaintiffs lacked standing to allege a constitutional violation. 255 F.3d at 333. The court reasoned that while the plaintiffs could not assert the claim as to "someone else's . . . computer, . . . [t]heir interest in the computer content present[ed] a different question and would depend on their expectations of privacy in the materials." Ibid. Noting a disclaimer posted on the bulletin board "stating that personal communications were not private[,]" the court rejected the standing of some of the plaintiffs to allege a Fourth Amendment

13

violation.  Ibid.  As to a second group of plaintiffs who used a different bulletin board, the court held:

> Users would logically lack a legitimate expectation of privacy in the materials intended for publication or public posting. They would lose a legitimate expectation of privacy in an e-mail that had already reached its recipient; at this moment, the e-mailer would be analogous to a letter-writer, whose "expectation of privacy ordinarily terminates upon delivery" of the letter.
>
> [Ibid. (quoting King, 55 F.3d. at 1196) (citation omitted).]

### C.

Our Supreme Court has considered a defendant's reasonable expectation of privacy in certain data in a variety of contexts.  Without specifically addressing the issue of standing, in State v. Evers, the Court needed to decide whether California law enforcement officers violated the defendant's federal and state constitutional rights by using pornographic material of children he posted in an internet chat room to secure a search warrant.  175 N.J. 355, 368 (2003).  The Court said, "[t]o invoke the protections of the Fourth Amendment and its New Jersey counterpart, Article I, Paragraph 7, [a] defendant must show that a reasonable or legitimate expectation of privacy was trammeled by government authorities."  Id. at 368–69 (citations omitted).  In rejecting the defendant's claim that he had such an expectation, the Court said, "An

14

individual ordinarily surrenders a reasonable expectation of privacy to information revealed to a third party. If that third party discloses the information to the government, the individual, who falsely believed his confidence would be maintained, will generally have no Fourth Amendment claim." Id. at 369 (citing United States v. Miller, 425 U.S. 435, 443 (1976); Guest, 255 F.3d at 335).

The Court, however, specifically addressed the defendant's standing to challenge law enforcement's use of subscriber information stored at the internet service provider's headquarters in Virginia to obtain a search warrant in New Jersey. Id. at 370. Before addressing the merits of the defendant's argument, the Court said that even though the defendant's wife was the account holder, it would "assume that [the] defendant ha[d] a privacy interest sufficient to invoke standing[.]" Ibid. (citing Alston, 88 N.J. at 228–29; Curry, 109 N.J. at 7–9). It concluded that the defendant had no federal or state constitutional privacy right to the subscriber information stored in Virginia. Id. at 374.

Defendant argues that Evers' expectation of privacy analysis has no application to the facts presented because "in that case [the defendant] sent an email directly to a police officer."[4] However, that has little relevance to the

---

[4] The defendant in Evers was responding to an anonymous email that police forwarded using a list-serve to a pornographic chat room. The defendant did

Court's decision, which was premised on the defendant's lack of control over the information once sent to a third party, even if he believed the data would remain confidential. Id. at 369.

Certainly, as to data maintained by service providers and not intended to be shared by a defendant with others, our Court has been a vigilant guarantor of protections provided by New Jersey's Constitution. See, e.g., State v. Lundsford, 226 N.J. 129 (2016) (tracing jurisprudence regarding constitutionally protected privacy interests in various forms of data, including phone billing records); accord State v. Mollica, 114 N.J. 329, 341–42 (1989) (finding that persons have a strong expectation of privacy in their telephone billing records); State v. Hunt, 91 N.J. 338, 347 (1982); State v. Earls, 214 N.J. 564, 588 (2013) (holding constitution protects privacy interest in cellphone location data stored by cell phone provider); State v. Reid, 194 N.J. 386, 389 (2008) (recognizing privacy interest in subscriber information given to an internet service provider); State v. McAllister, 184 N.J. 17, 32–33 (2005) (recognizing bank account holder's expectations of privacy in their banking records). We also acknowledge blanket assertions that persons lack a

---

(continued)
not send the pornographic material directly to a "police officer"; rather, he and dozens of other chat room users on the list-serve sent child pornography to the undercover detective. Id. at 364–65.

reasonable expectation of privacy regarding information disclosed to third parties have been widely criticized.[5]  There also may be important differences between a third party who is contractually or legally bound to hold a person's digital "papers and effects" and shield them from disclosure, and a third party who is simply counted on to exercise good judgment and discretion.  See Carpenter, ___ U.S. at ___, 138 S. Ct. at 2268–69 (Gorsuch, J., dissenting) (suggesting that property law, including law of bailments, may justify protection of data contractually entrusted to third parties); Positive Law

---

[5]  See, e.g., William Baude & James Y. Stern, The Positive Law Model of the Fourth Amendment, 129 Harv. L. Rev. 1821, 1872 (2016) (Positive Law Model) (stating, regarding the doctrine, "[a]s an empirical statement about subjective expectations of privacy, it seems quite dubious[, and a]s a normative assessment of when a person ought to be able to expect confidentiality (never), it is antisocial at best.").  Justices have questioned the doctrine from varying perspectives.  See United States v. Carpenter, ___ U.S. ___, ___ , 138 S. Ct. 2206, 2263 (2018) (Gorsuch, J., dissenting) (noting that "[p]eople often do reasonably expect that information they entrust to third parties, especially information subject to confidentiality agreements, will be kept private"); United States v. Jones, 565 U.S. 400, 417 (2012) (Sotomayor, J., concurring) (stating "it may be necessary to reconsider the premise that an individual has no reasonable expectation of privacy in information voluntarily disclosed to third parties," noting the doctrine "is ill suited to the digital age, in which people reveal a great deal of information about themselves to third parties in the course of carrying out mundane tasks").  Notably, in Carpenter, the Court apparently narrowed the doctrine, stating even where data is shared with a third party, a court must consider "'the nature of the particular documents sought' to determine whether 'there is a legitimate "expectation of privacy" concerning their contents.'" ___ U.S. at ___, 138 S. Ct. at 2219 (quoting Miller, 425 U.S. at 442)).

Model, 129 Harv. L. Rev. at 1860 (suggesting that positive law principles may provide a basis for an expectation of privacy); Laura K. Donohue, Functional Equivalence and Residual Rights Post-Carpenter: Framing a Test Consistent with Precedent and Original Meaning, 2018 Sup. Ct. Rev. 347, 400, 402–03 (2018) (suggesting that where federal or state law create a right or privilege over information and access, government intrusion may constitute a search or seizure).

Although our Court has declined to follow the third-party doctrine where the third party is a common carrier, an internet provider, or a bank, the Court in Evers applied it to person-to-person digital communications, holding, "[t]here is no constitutional protection for misplaced confidence [.]"   175 N.J. at 370.   The defendant in Evers had no basis to question consent, but the Court's broad application of the doctrine forecloses a reasonable expectation of privacy in this case, particularly absent a contractual or other legal obligation to protect defendant's text messages to DeWitt.   However persuasive criticism of the third-party doctrine may ultimately be, we will not chart a path independent of the United States Supreme Court regarding the Fourth Amendment, or our State Supreme Court regarding Article I, Paragraph 7 of the New Jersey Constitution.

We are aware of no reported case holding that an individual maintains a

reasonable expectation of privacy protected by the New Jersey Constitution as to data he chooses to share directly with another after that data has been received by the intended recipient. Furthermore, under the facts of this case, defendant has not demonstrated that he had "an actual (subjective) expectation of privacy[,]" Katz, 389 U.S. at 361 (Harlan, J., concurring), that is, he subjectively expected DeWitt to keep his threatening messages to herself; nor has he demonstrated that "society is prepared to recognize as 'reasonable[,]'" ibid., an expectation that threats of violence will remain private. We conclude that defendant had no reasonable expectation of privacy in the text messages he sent to DeWitt once she received them.

How does that conclusion affect defendant's standing to challenge the warrantless search of DeWitt's phone?

### III.

It seems logical that if a defendant has no reasonable expectation of privacy as to the place searched or item seized, he can have no standing to assert a claim under Article I, Paragraph 7 of the New Jersey Constitution. Yet, as already noted, while "[o]ur standard . . . incorporates the legitimate expectation of privacy standard[, it] offers broader protections that advance three important State interests." Shaw, 237 N.J. at 616 (citing Johnson, 193 N.J. at 543).

> The first is the State's interest in protecting defendants from having to admit possession to vindicate their constitutional right against unreasonable searches and seizures. The second is to prevent the State from arguing a defendant should be subject to criminal liability for possessing contraband, while asserting the same defendant had no privacy interest in the area from which police obtained the contraband without a warrant. Our third aim is to increase privacy protections for our citizens and to promote respect for our Constitution by discouraging law enforcement from carrying out warrantless searches and seizures where unnecessary.
>
> [Ibid. (citing Johnson, 193 N.J. at 543).]

Nevertheless, "[w]hether in a particular case a defendant should be permitted to object to the use of illegally obtained evidence in a criminal trial will depend . . . on the particular factual circumstances in which the issue arises." Curry, 109 N.J. at 8.

The Court has made clear that the two concepts — possessing a reasonable expectation of privacy and standing to challenge a search and seizure — are not congruent. At least as it relates to searches "concerning real property," the Court has carved out "three exceptions to the automatic standing rule" without regard to whether a defendant had an expectation of privacy in the place searched. Randolph, 228 N.J. at 585. A defendant lacks "standing to challenge a search of abandoned property, property on which he was

trespassing," ibid. (citing Brown, 216 N.J. at 529), "or property from which he was lawfully evicted[.]" Ibid. (citing State v. Hinton, 216 N.J. 211 (2013)).[6]

Before us, defendant concedes he had no proprietary or possessory interest in the text messages he sent to DeWitt but argues that he had a "participatory interest" in that data. Defendant asserts he was "intimately tied to the creation of this evidence . . . because [he] was one of only two parties involved in the conversation." We therefore focus our attention on those cases that have considered standing to suppress evidence based upon a defendant's "participatory interest" in the seized evidence, in this case, the text messages defendant sent to DeWitt.[7]

Perhaps the Court's first elaboration on the concept of standing based on a defendant's participatory interest in the seized evidence was in Mollica.

---

[6] However, in Hinton, the Court specifically implied that the defendant had automatic standing to challenge the search of an apartment from which his mother had been evicted, but for which the warrant of removal was in the process of execution. 216 N.J. at 234–35. The Court said, "Even when a defendant has automatic standing, if . . . the merits rest on whether defendant possesses a reasonable expectation of privacy, the court must address that issue as part of the substantive constitutional analysis. That inquiry is separate and distinct from the question of standing." Id. at 234 (citing State v. Harris, 211 N.J. 566, 589–90 (2012)).

[7] Defendant's argument does not specifically include any other data, such as a call log, which also was presumably retrieved from DeWitt's phone. Our analysis applies to all data recovered by police from her phone without a CDW.

There, the defendant moved to suppress the toll call records from his co-defendant's hotel room, obtained by the Federal Bureau of Investigation without a warrant and used to secure warrants for the hotel rooms both men occupied as part of an alleged bookmaking operation. Id. at 335–36. The Court succinctly framed the issue:

> We must determine preliminarily whether one of the defendants in this appeal . . . has standing to challenge the seizure of the telephone toll records involving the hotel room telephone of another individual. This issue arises because the telephone involved was not in [the defendant's] hotel room, but in that of the co-defendant . . . .
>
> [Id. at 337.]

The Court noted that "[a] participatory interest . . . stresses the relationship of the evidence to the underlying criminal activity and defendant's own criminal role in the generation and use of such evidence." Id. at 339. The Court refined this observation, stating,

> Unlike the terms "possessory" or "proprietary," which denote property concepts, "participatory" connotes some involvement in the underlying criminal conduct in which the seized evidence is used by the participants to carry out the unlawful activity. It thus provides standing to a person who, challenging the seizure and prosecutorial use of incriminating evidence, had some culpable role, whether as a principal, conspirator, or accomplice, in a criminal activity that itself generated the evidence.

22

[Id. at 339–40 (emphasis added) (citing Black's Law Dictionary 1007 (5th ed. 1979)).]

The Court concluded that "the involvement of [the] defendant in criminal gambling activities that generated telephone toll records invest[ed the] defendant with standing to challenge the validity of the seizure of this evidence." Id. at 340.

In State v. Arthur, while conducting surveillance in a heavily trafficked narcotics area, police observed a person enter the defendant's car, briefly sit in the passenger's seat, and exit carrying a paper bag. They stopped the person and searched the bag, finding narcotics paraphernalia. The defendant's car had already left the scene, but when it was later stopped by police, the defendant admitted to having cocaine, which police found upon searching his pockets. 149 N.J. 1, 3 (1997). In reversing our judgment, the Court found that the police stop of defendant's car was justified, independent of the prior stop of the passenger. Id. at 12–13.

Nevertheless, because we had concluded the stop of the passenger was "intertwined" with the stop of the defendant's car, the Court discussed, without deciding, whether the defendant had standing to challenge the seizure of drug

paraphernalia from the passenger. Ibid.[8] The Court noted that despite the "broad standing rule" established by Alston and Mollica, neither "address[ed] the standing requirement in cases in which a defendant clearly had abandoned or relinquished his possessory interest in the property being seized[,] or in which his participatory interest in that property had become very remote or attenuated at the time of the seizure." Ibid. (emphasis added); see also Curry, 109 N.J. at 10 (noting "the nexus between the [seized] property and the individual defendants [may] become[] so attenuated as to eliminate standing").

In State v. Bruns, police conducted a motor vehicle stop, arrested the driver on an outstanding warrant, conducted a search of the passenger compartment after removing Evans, a passenger, and "found a [toy] gun and a large knife under the front passenger seat." 172 N.J. 40, 44 (2002). Police did not enter the items into evidence until months later when they realized there was an open investigation of an armed robbery that occurred seven days before the motor vehicle stop, and which possibly involved Evans and the defendant. Ibid. After a survey of our case law, including Curry, Mollica and Arthur, and decisions from federal circuit courts, the Court reiterated its adherence to the

---

[8] See also State v. Biancamano, 284 N.J. Super 654, 657–59 (App. Div. 1995) (holding "[t]here [was] no question that under [Alston]" the defendant, involved with another student in distributing LSD at school, had standing to suppress the seizure of drugs from a pen carried by the other student).

"broad standing rule" it articulated in <u>Alston</u>. <u>Id.</u> at 56. The Court noted that on the record presented, the "defendant cannot claim a proprietary or possessory interest in the vehicle that was searched." <u>Ibid.</u>

Turning to the defendant's asserted "participatory interest in the weapons seized because they were used to commit the robbery for which he was charged[,]" the Court noted that the robbery took place one week before the seizure, and the search and seizure was based upon the driver's arrest following a motor vehicle violation, committed while the defendant "was not a passenger in the vehicle and . . . was not in the vicinity of the vehicle at the time it was searched." <u>Id.</u> at 57. "Accepting th[e] generalized connection" that could be drawn "between the weapons seized from [the] car and the crime with which [the defendant] was charged[,]" the Court was "unpersuaded that that connection [was] adequate to confer standing based on a participatory interest." <u>Id.</u> at 57–58.

> <u>That evidence implicates a defendant in a crime is not, in and of itself, sufficient to confer standing</u>. There also must be at a minimum some contemporary connection between the defendant and the place searched or the items seized. Despite our broad standing rule, we acknowledge the soundness of the general principle that "suppression of the product of a Fourth Amendment violation can be successfully urged only by those whose rights were violated by the search itself, not by those who are aggrieved solely by the introduction of damaging evidence."

. . . .

> Although we recognize that in most cases in which the police seize evidence implicating a defendant in a crime that defendant will be able to establish an interest in the property seized or place searched, our broad standing rule necessarily has limits. If substantial time passes between the crime and the seizure of the evidence, and a proprietary connection between defendant and the evidence no longer exists, the defendant's basis for being aggrieved by the search will have diminished. In addition to the temporal aspects of a specific search or seizure, <u>a showing that the search was not directed at the defendant or at someone who is connected to the crime for which he has been charged also will diminish a defendant's interest in the property searched or seized</u>.
>
> [<u>Id.</u> at 58–59 (emphasis added) (citation omitted) (quoting <u>Alderman v. United States</u>, 394 U.S. 165, 171–72 (1969)).]

The Court concluded the defendant lacked standing to challenge the seizure of the evidence. <u>Id.</u> at 59; <u>see also</u> <u>State v. Abdullah</u>, 372 N.J. Super. 252, 273–74 (App. Div. 2004) (concluding the defendant had no standing to suppress incriminating evidence seized from the deceased victim's apartment because he lacked "a proprietary, possessory or participatory interest" in the apartment), <u>rev'd on other grounds</u>, 184 N.J. 497 (2005).

In <u>State v. Harris</u>, we considered whether the defendant had standing to seek suppression of the tape from an answering machine located in the bedroom of a co-conspirator's apartment, where the murder victim was found.

298 N.J. Super. 478, 482 (App. Div. 1997). The State contended that the defendant was hired by two co-conspirators to kill the victim after luring him to the apartment. Id. at 481. The tape contained a recorded conversation made several minutes after the shooting between the co-conspirators about the payment due to the defendant. Id. at 482–83. We concluded the defendant had a participatory interest in the tape because he "had some culpable role, whether as a principal, conspirator or accomplice in a criminal activity that generated the evidence seized." Id. at 484 (citing Mollica, 114 N.J. at 339–40); see also State v. Arias, 283 N.J. Super. 269, 276 (Law Div. 1992) (interpreting Mollica and holding "'participatory' connotes some involvement in the underlying criminal conduct in which the seized evidence is used by the participants to carry out the unlawful activity").

Here, the mere fact that the text messages could be evidence used by the State to prove defendant's commission of a crime does not confer standing upon him to seek their suppression. Bruns, 172 N.J. at 58. If the potential evidentiary use of a seized item were alone sufficient, every defendant could conceivably assert rights untethered to the Fourth Amendment or Article I, Paragraph 7 of our Constitution.

Nor do we accept defendant's argument that his authorship of the texts conferred standing upon him to challenge their warrantless seizure from

DeWitt's cell phone. Defendant and DeWitt were not participants in the commission of a crime. "[T]he search was not directed at . . . defendant or at someone who [was] connected to the crime for which he has been charged[.]" Id. at 59 (emphasis added). Defendant and DeWitt were not co-conspirators, nor was defendant her accomplice, and, unlike the gambling activity in Mollica, defendant's criminal activity — the deadly shooting of Heath — was not "that [which] itself generated the evidence." 114 N.J. at 340 (emphasis added); accord Harris, 298 N.J. Super. at 484; Arias, 283 N.J. Super. at 286.

IV.

As noted, our expansive "automatic standing" rule promotes three specific interests in addition to the reasonable expectation of privacy in places and things protected by the Fourth Amendment. Shaw, 237 N.J. at 616. By permitting a defendant to challenge a search or seizure based on his proprietary or possessory interest in the place searched or property seized, ideas deeply rooted in "property concepts," Mollica, 114 N.J. at 339, we "protect[] defendants from having to admit possession to vindicate their constitutional right . . . [and] prevent the State from arguing a defendant should be subject to criminal liability for possessing contraband, while asserting the same defendant had no privacy interest in the area from which police obtained the contraband without a warrant." Shaw, 237 N.J. at 616 (citations omitted).

Those interests are not involved in this case, as defendant essentially concedes by not arguing that his standing rests on these grounds.

Nor does permitting defendant to challenge the search of DeWitt's phone in this case serve the third interest that undergirds our automatic standing jurisprudence. Granting defendant standing in this case does not "increase privacy protections for our citizens[,]" ibid., since, as we explained in detail above, defendant had no reasonable expectation of privacy in those text messages on DeWitt's phone. And, under the particular facts of this case, permitting defendant to bring a challenge to the search of DeWitt's phone does not have the salutary effect of "discouraging law enforcement from carrying out warrantless searches and seizures where unnecessary." Ibid.; see Bruns, 172 N.J. at 58 ("Despite our broad standing rule, we acknowledge the soundness of the general principle that 'suppression of the product of a Fourth Amendment violation can be successfully urged only by those whose rights were violated by the search itself, not by those who are aggrieved solely by the introduction of damaging evidence.'") (quoting Alderman, 394 U.S. at 171–72).

Affirmed.

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION

A-2102-17T2